UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

SUSAN GAYNOE CAMPERLINO,

     Plaintiff,

v.                                    Case No. 3:15cv222-CJK

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

     Defendant.

_____/

MEMORANDUM ORDER

This matter is before the court pursuant to 42 U.S.C. § 405(g) for review of a final determination of the Commissioner of Social Security ("Commissioner") denying Susan Camperlino's applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-34, and Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. §§ 1381-83. The parties have consented to Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73 for all proceedings in this case, including entry of final judgment. Upon review of the record before the court, I conclude the findings of fact and determinations of the Commissioner are

supported by substantial evidence.  The decision of the Commissioner, therefore, will be affirmed and the applications for benefits denied.

## ISSUES ON REVIEW

Ms. Camperlino, who will be referred to as claimant, plaintiff, or by name, raises three issues on appeal.  She claims: (1) the Administrative Law Judge ("ALJ") failed to properly weigh the medical opinion evidence, (2) the ALJ failed to properly evaluate her credibility, and (3) the ALJ relied on flawed vocational expert testimony.  (Doc. 15).

## PROCEDURAL HISTORY

Ms. Camperlino filed applications for DIB and SSI on June 1, 2011, alleging disability beginning May 13, 2008.  T. 222-37.[1]  The Commissioner denied the claims.  T. 135-47; 150-61.  Ms. Camperlino requested a hearing before an ALJ.  T. 162-63.  The request was granted, and the hearing occurred on May 22, 2013 by video-teleconference.  T. 39-71.  Following the hearing, the ALJ issued a decision finding Ms. Camperlino not disabled.  T. 17-38.  Ms. Camperlino requested review by the Appeals Council, which denied her request.  T. 1-5, 16.  The ALJ's decision therefore became the final determination of the Commissioner.

---

[1] The administrative record, as filed by the Commissioner, consists of nineteen volumes (docs. 13-2 through 13-20) and has 1316 consecutively numbered pages. References to the record will be by "T." for transcript, followed by the page number(s).

## FINDINGS OF THE ALJ

In his written decision, the ALJ made a number of findings relative to the issues raised in this appeal:

- "The claimant has the following severe impairments: cervical degenerative disc disease, hepatitis C, fibromyalgia, hypertension, chronic obstructive pulmonary disease (COPD), mood disorder, and substance abuse (20 CFR 404.1520(c) and 416.920(c))." T. 22.

- "The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926)." T. 23.

- "[C]laimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except the claimant would be limited to simple, routine, repetitive tasks involving only simple work-related decisions with few workplace changes." T. 24-25.

- "The claimant is capable of performing past relevant work as a prep cook and cutter/slicer. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965)." T. 29.

- "The claimant has not been under a disability, as defined in the Social Security Act, from May 7, 2008, through the date of this decision (20 CFR 404.1520(f) and 416.920(f))."  T. 31.

## STANDARD OF REVIEW

A federal court reviews the "Commissioner's decision to determine if it is supported by substantial evidence and based upon proper legal standards."  *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997); *see also Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied.").  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (*quoting Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)).  "Substantial evidence is something 'more than a mere scintilla, but less than a preponderance.'"  *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (*quoting Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)).  Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence.  *Sewell v. Bowen*, 792 F.2d 1065, 1067 (11th Cir. 1986).

When reviewing a Social Security disability case, the court "'may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner.]'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (*quoting Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)); *see also Hunter v. Soc. Sec. Admin., Comm'r*, 808 F.3d 818, 822 (11th Cir. 2015) ("In determining whether substantial evidence supports a decision, we give great deference to the ALJ's factfindings.") (*citing Black Diamond Coal Min. Co. v. Dir., OWCP*, 95 F.3d 1079, 1082 (11th Cir. 1996)).  A reviewing court also may not look "only to those parts of the record which support the ALJ[,]" but instead "must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983).  Review is deferential to a point, but the reviewing court conducts what has been referred to as "an independent review of the record." *Flynn v. Heckler*, 768 F.2d 1273 (11th Cir. 1985).[2]

The Social Security Act defines disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or

---

[2] The Eleventh Circuit not only speaks of an independent review of the administrative record, but it also reminds us that it conducts a *de novo* review of the district court's decision on whether substantial evidence supports the ALJ's decision. *See Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002).

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To qualify as a disability, the physical or mental impairment must be so severe that the plaintiff not only is unable to do her previous work, "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]"  *Id.* § 423(d)(2)(A).

Pursuant to 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4), the Commissioner analyzes a disability claim in five steps:

1.     If the claimant is performing substantial gainful activity, she is not disabled.

2.     If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3.     If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.     If the claimant's impairments do not prevent her from performing her past relevant work, she is not disabled.[3]

5.     Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates the claimant's residual functional capacity and vocational factors, she is not disabled.

Step five (or step four in cases such as this one where the ALJ decides a claimant can perform past work) is generally where the rubber meets the road.  At that point, the ALJ formulates the all-important residual functional capacity.  The ALJ establishes residual functional capacity, utilizing the impairments identified at step two, by interpretation of (1) the medical evidence; and (2) the claimant's subjective complaints (generally complaints of pain).  Residual functional capacity is then used by the ALJ to make the ultimate vocational determination required by step four or five.[4]  "[R]esidual functional capacity is the most [a claimant] can still

---

[3] Claimant bears the burden of establishing a severe impairment that keeps her from performing her past work.  *Chester v. Bowen*, 792 F. 2d 129, 131 (11th Cir. 1986).

[4] "Before we go from step three to step four, we assess your residual functional capacity. (See paragraph (e) of this section.) We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps."  20. C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

do despite [claimant's] limitations.[5]   20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

Often, both the medical evidence and the accuracy of a claimant's subjective

complaints are subject to a degree of conflict and that conflict leads, as in this case,

to the points raised on judicial review by the disappointed claimant.

## FACT BACKGROUND AND MEDICAL HISTORY

Ms. Camperlino was born in 1956 and was fifty-one years old at the claimed

onset of disability.   She had a high school education and some college, and past

relevant work as a bartender, deli cutter/slicer, prep cook, waitress, and manager

trainee.   T. 67-68, 252-53.   She testified at the hearing that she became unable to

---

[5] In addition to this rather terse definition of residual function capacity, the Regulations describe how the Commissioner makes the assessment:

> (3) Evidence we use to assess your residual functional capacity. We will assess your residual functional capacity based on all of the relevant medical and other evidence. In general, you are responsible for providing the evidence we will use to make a finding about your residual functional capacity.   (See § 416.912(c).)   However, before we make a determination that you are not disabled, we are responsible for developing your complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help you get medical reports from your own medical sources.   (See §§ 416.912(d) through (f).) We will consider any statements about what you can still do that have been provided by medical sources, whether or not they are based on formal medical examinations.    (See  § 416.913.)   We will also consider descriptions and observations of your limitations from your impairment(s), including limitations that result from your symptoms, such as pain, provided by you, your family, neighbors, friends or other persons.   (See paragraph (e) of this section and § 416.929.)[.]

20 C.F.R. § 416.945(a)(3).

work due to pain, panic attacks, and hallucinations.  T. 64.  She began experiencing pain, hallucinations, and paranoia as early as 2005, but her fibromyalgia became "real severe" and she began having panic attacks in 2008.  T. 47-48.  She had panic attacks a few times a week and, at times, twice in one day.  T. 59.  She had them in public, when driving, and while sleeping.  T. 59.  The attacks made her unable to catch her breath, nervous, jerk, shake, and "so full of fear she just cr[ied]."  T. 59-60.  She tried several times to return to work, but had not "been able to do it for any length of time."  T. 44.  She had to call in sick "quite a bit" because of pain, and she experienced auditory hallucinations at work and crying spells when going home.  T. 44-46.

Ms. Camperlino lived with her ex-husband in a cabin on her brother's property.  T. 53.  She testified that when having a fibromyalgia flareup, she spent most of her day lying down to relieve the pain.  T. 62-63.  She used cocaine and morphine from 2008 to approximately October 2011.  T. 50-51.  According to Ms. Camperlino, "the morphine helped with the pain and also the cocaine helped with the pain and also the chronic fatigue.  And it's like I've been medicating – self-medicating for many years."  T. 50-51.  At the time of the hearing, she was in a Methadone program.  T. 58.  She also was in her last semester of an associate's degree program in hospitality management.  T. 43.  She says she informed the school

of her disabilities and was given accommodations, including excused absences and allowing her to withdraw when needed, make up tests, and extra time to complete assignments. T. 54, 64. She still had difficulty and missed over half her classes and some tests. T. 54, 63-64.

Claimant seeks disability beginning May 7, 2008. T. 222-35; 247. On May 14, 2008, she was admitted to the Crisis Stabilization Unit at Lakeview Center, Inc. ("Lakeview"), a behavioral health services facility, after complaining of severe pain and suicidal ideation. T. 564-65. The next day, she saw Kaberi Samanta, M.D., a psychiatrist. T. 564-66. Ms. Camperlino related to Dr. Samanta her diagnosis with fibromyalgia and chronic fatigue syndrome in 2007, and that she had become depressed and suicidal. T. 564. She also admitted to a relapse of cocaine and alcohol ten days earlier, after ten years of sobriety, and stated she wanted to begin detoxification, resume treatment, and obtain proper medication. T. 564. She said nothing helped the pain, which made it difficult for her to work. T. 564. A mental status examination revealed a constricted affect, hopelessness, helplessness, worthlessness, guilt, and fleeting suicidal thoughts. T. 565. Dr. Samanta diagnosed depressive disorder, alcohol and cocaine abuse and dependence, and substance induced mood disorder. T. 564. She put Ms. Camperlino on "mild detox" and

assigned a GAF score of 40.  T. 565.  Ms. Camperlino was to be "discharged to the appropriate setting when stabilized."  T. 565.

On June 27, 2008, Ms. Camperlino saw Myron Almond, M.D., another psychiatrist at Lakeview.  T. 555.  She reported taking antidepressants on and off throughout her life and had been sober since her hospitalization the previous month.  T. 555.  She also said she had chronic fatigue syndrome and found it difficult to work.  T. 555.  Dr. Almond diagnosed depressive disorder, alcohol and cocaine abuse and dependence, and substance induced mood disorder.  T. 555.  He increased Ms. Camperlino's dose of Effexor and substituted Vistaril for Buspar.  T. 556.

Ms. Camperlino saw Dr. Almond for follow-up on August 29, 2008.  T. 553.  Dr. Almond noted Ms. Camperlino's Effexor dose had been increased two weeks earlier because of auditory hallucinations and increased depression.  T. 553.  Ms. Camperlino stated she was still hearing voices, especially in public, and having difficulty sleeping because she was "very hyper-alert" at night and feared her ex-husband.  T. 553.  She had started working part-time at a grocery store and said "it really helps her to be out of the house and be involved with people."  T. 553.  A mental status examination revealed mild depression and anxiety.  T. 553.  Dr. Almond diagnosed depressive disorder, possible post-traumatic stress disorder, alcohol and cocaine abuse and dependence in short-term remission, and substance

induced mood disorder; he substituted Trazodone for Sinequan and assigned a GAF score of 60.  T. 553-54.

During a December 12, 2008 visit, Ms. Camperlino informed Dr. Almond she was working approximately thirty hours per week at a grocery store and hoped to eventually work full-time.  T. 551.  She continued to have "lots of pain" and "report[ed] that at work, she is concerned that people are talking about her and it is almost like hearing her name being called."  T. 551.

During a medication management appointment on March 20, 2009, Ms. Camperlino reported she remained sober and continued to work -- at Publix and Denny's.  T. 543.  Dr. Almond noted a mildly depressed and anxious mood and mildly constricted affect; he assigned a GAF score of 65-70.  T. 543.  Dr. Almond found plaintiff stable overall but with continued mild paranoid symptoms.  T. 543. He prescribed Risperal and told her to return in three to four months unless she had significant changes in symptoms or medication side effects.  T. 543.

On May 4, 2009, plaintiff presented at Lakeview for voluntary admission due to suicidal thoughts and severe mood swings, which she described as "feeling energetic, wound very tight, on top of the world, grandiose, not sleeping, impulsivity, paranoia, auditory hallucinations that people are talking about her, especially at work."  T. 541.  Ms. Camperlino explained that after a few days to a

couple of weeks in such a state, she would "crash, and sleep 12+ hours per day, cry all day, feel hopeless, helpless, and worthless, have suicidal thoughts, anger, not want to get out of bed."  T. 541.  Upon admission, Ms. Camperlino reported "she could not make it anymore."  T. 538.  She "had increasing bouts of anxiety, mood swings, depression, and . . . [was] just not able to function."  T. 538.  She reported mood swings "wherein she [would] go into her highs and lows but stay[ ] depressed a lot."  T. 538.  When depressed, Ms. Camperlino could not stop crying and was very irritable and moody, could not get out of bed, and had suicidal thoughts.  T. 538.  She also had bouts of hyperactivity and feelings of grandiosity and impulsivity.  T. 538.  She reported she was "struggling to make it at her job, and because of her mood swings," could not "function well."  T. 538.

A mental status examination revealed a very depressed mood and affect, poor judgment, and auditory hallucinations and paranoia at times, including voices commanding her to harm herself.  T. 539, 542.  Dr. Cynthia Javellana, a psychiatrist, noted Ms. Camperlino appeared tired and haggard and diagnosed bipolar disorder, major depressive disorder, and alcohol and cocaine abuse and dependence in early remission.  T. 539.  Upon discharge almost a week after she was admitted, Ms. Camperlino felt "a whole lot better," was "sleeping well and eating well," was no

longer suicidal or having auditory or visual hallucinations, suspicions, or paranoia, and wanted to go home.  T. 537.

On May 14, 2009, Ms. Camperlino contacted Lakeview to reschedule an appointment she missed the day before and report she was safe at home and experiencing no suicidal ideation; she was "'doing better' and looking forward to beginning counseling services."  T. 534.  Ms. Camperlino did not show for a June 18 appointment.  T. 532.  As of July 17, however, she had a "normal mental status examination with frequent smiles and no thoughts of suicide;" she was doing well overall.  T. 530.  Her GAF score was 70.  T. 530.

On October 16, 2009, plaintiff reported she had reduced her Risperdal by half as a result of side effects.  T. 524.  Her mental status examination was normal – she smiled frequently and denied suicidal thoughts.  T. 524.  She reported her paranoid symptoms and mood swings had "totally gone away," and asked to stop treatment with antipsychotic medication.  T. 524.  On May 14, 2010, Ms. Camperlino rated herself a 5 on a scale of 1 to 9.  T. 582.  She also said she was "making a high grade point in her school and . . . "thinking about going for two additional years."  T. 1108.

Ms. Camperlino was involuntarily admitted to the hospital on December 24, 2010 due to depression and suicidal thoughts.  T. 416.  A mental status examination revealed intermittent eye contact and a depressed mood and affect; she also "made

a suicidal statement." T. 417, 421, 423. Ms. Camperlino was diagnosed with depression and opioid, cocaine, and alcohol dependence. T. 420, 424. She was treated with Librium, Cymbalta, Clonidine, and Seroquel and discharged on December 28 with a GAF score of 55. T. 423-24.

Ms. Camperlino had a follow-up visit with Dr. Almond two days later. T. 1051. She stated she tried to go back to school but was unable to continue because of pain. T. 1051. She sustained injuries in a motor vehicle accident and was taking Lortab and Methadone for the pain. T. 1051. A mental status examination revealed mild to moderate depression and tearfulness. T. 1051. Dr. Almond continued her on Effexor and Seroquel; he later substituted Cymbalta for Effexor and added Vistaril. T. 1052, 1054-55.

Ms. Camperlino saw Dr. Heather Rohrer, another psychiatrist, on April 8, 2011 and stated she was taking additional Cymbalta to help with pain and had difficulty sleeping. T. 934. She asked if she could resume taking Trazodone. T. 934. She had not started substance abuse treatment and counseling because she made failing grades in school and was trying to make them up. T. 934. She admitted to "struggling with [her] addiction" to Morphine and "showed [Dr. Rohrer] that she ha[d] been injecting liquid Morphine and although she [was] no longer taking that

medication, she ha[d] tracks on her hands." T. 934. In fact, a clinic refused to treat her for a urinary tract infection because of the tracks. T. 934.

A mental status examination revealed "fidgety" and "whiny" behavior, a tearful affect, and suicidal thoughts. T. 934. Dr. Rohrer diagnosed opiate dependence in early remission by report, post-traumatic stress disorder ("PTSD"), history of attention deficit/hyperactivity disorder ("ADHD"), bipolar disorder, and major depressive disorder. T. 934-35. She continued plaintiff on Cymbalta, Seroquel, and Vistaril at plaintiff's request. T. 935.

A little more than a year later, on May 28, 2011, Ms. Camperlino presented for voluntary detox, suffering obvious withdrawal symptoms. T. 576. She described her addiction to morphine and Valium, both of which she got from her husband, and her alcohol and cocaine dependence. T. 576. She explained she was diagnosed with fibromyalgia three years ago, which "changed [her] life." T. 576. She also broke her back in the car accident. T. 576. She was "[h]elpless, hopeless and worthless, tearful," but she indicated she was trying to go to school to learn a trade. T. 576, 588.

Ms. Camperlino had a tele-psychiatry session with Dr. Rohrer on July 15, 2011. T. 592, 1057. She did not have "the need for intensive psychiatric intervention" at that time. T. 592. She stated, however, that her medication was not

working and she had been taking Valium given to her by a friend.  T. 1057.  She asked for "something stronger" than her most recent medications, but Dr. Rohrer declined.  T. 1057.  She observed plaintiff was extremely fidgety and tended to whine.  T. 1057.  A mental status examination revealed an anxious and dysphoric affect and complaints of "weird" thoughts and paranoia.  T. 1057.  Dr. Rohrer diagnosed opiate dependence, benzodiazepine abuse, history of bipolar disorder, major depressive disorder, PTSD, and ADHD.  She started Ms. Camperlino on Trazodone.  T. 1057-58.

On September 30, Ms. Camperlino rated herself a 6 out of 9.  T. 661.  Two weeks later, however, she stated she was in a wheelchair and "couldn't walk [she] was in so much pain.  The Methadone helps."  T. 663.  A mental status examination revealed fidgeting and whining, an anxious and dysphoric affect, tearfulness, thoughts of death, and hallucinations.  T. 663.  Dr. Rohrer increased plaintiff's dose of Seroquel and assigned a GAF score of 50.  T. 664.  Shortly thereafter, plaintiff "cooked an enormous dinner and enjoyed being busy," although she later felt pain "from standing for long periods of time cooking."  T. 665.

Ms. Camperlino continued having suicidal ideation as late as August 2012.  T. 814.  She nevertheless worked part-time and/or attended school.  T. 814.  And she repeatedly rated herself a 6 or higher on a 9-point scale.  T. 830, 834, 835, 1219.

On a Psychiatric/Psychological Impairment Questionnaire completed May 4, 2013, Dr. Almond noted he had diagnosed Ms. Camperlino with ADHD, bipolar disorder, and substance abuse and that her primary symptoms were depression, paranoia, and anxiety, with depression and paranoia being the most severe. T. 1270, 1272. Dr. Almond indicated Ms. Camperlino was markedly limited in her ability to remember locations and work-like procedures, understand and remember one- or two-step instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerance, sustain ordinary routine without supervision, complete a normal workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, accept instructions, respond appropriately to criticism from supervisors and maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, travel to unfamiliar places or use public transportation, and set realistic goals or make plans independently. T. 1273-75. He indicated plaintiff was moderately limited in the ability to understand and remember detailed instructions, work in coordination with or proximity to others without being distracted by them, interact appropriately with the general public, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, respond appropriately to

changes in the work setting, and be aware of normal hazards and take appropriate precautions.  T. 1273-75.  He found Ms. Camperlino only mildly limited in the ability to carry out simple one- or two-step instructions, carry out detailed instructions, make simple work related decisions, and ask simple questions or request assistance.  T. 1273-75.

Dr. Almond also prepared a letter describing his treatment of plaintiff.  He stated that, during the two to three years he treated Ms. Camperlino, she had significant, consistent psychotic and mood symptoms treated with both antidepressant and antipsychotic medication.  T. 1279.  She also had episodic substance abuse, but that was not the primary focus of her treatment.  T. 1279.  Dr. Almond clarified that Ms. Camperlino "had significant psychiatric symptoms in the absence of substance abuse issues."  T. 1279.  He completed a report on May 4, 2013, stating Ms. Camperlino was disabled as of February 2011 for reasons other than substance abuse, which was symptomatic of her underlying condition.  T. 1278.

Multiple state agency consultants reviewed the record in this case. T. 75-134, 695.  One consultant, Deborah Carter, Ph.D., disagreed with Dr. Almond, finding Ms. Camperlino "would have difficulty comprehending and remembering complex instructions but seems fully capable of understanding and remembering simple instructions and work tasks."  T. 127.  In her Mental Residual Functional Capacity

Assessment, Dr. Carter stated "claimant would likely have problems carrying out detailed instructions, maintaining sustained attention/concentration, and completing work tasks at a consistent pace.  However, claimant seems capable of working without excessive supervision or assistance and is able to work with others."  T. 128. Dr. Carter concluded "[c]laimant would have difficulty appropriately responding to high-stress work environments.  However, claimant appears capable of completing tasks successfully in low stress settings."  T. 128.

During the hearing, the ALJ posed the following hypothetical to the vocational expert ("VE"):

> I assume I find that a hypothetical individual the same age as the claimant with the same educational level and vocational history - - and assume further I find the following additional limitations: This individual can perform a range of medium work, which is lifting up to 50 pounds occasionally; lift or carry up to 25 pounds frequently - - medium work as defined by the regs; stand or walk for approximately six hours per eight-hour work day; and sit for approximately six hours per eight-hour work day; and work limited to simple, routine, and repetitive tasks involving only simple work-related decisions with few work place changes.

T. 68.  The ALJ then asked whether a person with those limitations could return to Ms. Camperlino's "past work or any part thereof."  T. 68.  The VE responded that such an individual could perform the prep cook and deli cutter/slicer positions Ms. Camperlino previously performed.  T. 68.  When

asked whether there were any jobs in the national economy "with those limitations," the VE responded "Yes, Your Honor.  I would state, with that hypothetical, such an individual would be able to work as a hand packager." T. 69.  The VE also said "such an individual would be able to work as a cleaner, industrial."  T. 69.

Ms. Camperlino's counsel asked the VE about a person with "a marked limitation, where marked means essentially precluded from the ability to . . . remember locations and work-like procedures." T. 69.  Specifically, he asked what impact such limitation would "have on her past relevant work."  T. 69-70.  According to the VE, "[a]ny marked limitation would eliminate all employment . . . [e]specially if you couldn't remember where you're at and it was marked, that would be tremendously . . . ."  T. 69.  Plaintiff's counsel then attempted to clarify that "[a] marked limitation in the ability to understand and remember one- or two-step instructions would preclude employment as well." T. 70.  The VE confirmed, stating "[a]bsolutely.  Just one marked will preclude employment at the marked level."  T. 70.  Based on the record before him, the ALJ found Ms. Camperlino "capable of performing past relevant work as a prep cook and cutter/slicer."  T. 29.

ANALYSIS

A.      Treating Physician's Opinion

Plaintiff first argues the ALJ erred when he afforded the opinion of her treating physician, Dr. Almond, "virtually no weight."   Absent good cause, the opinion of a claimant's treating physician must be accorded considerable or substantial weight by the Commissioner.  *Phillips v. Barnhart*, 357 F.3d 1232, 1240-1241 (11th Cir. 2004); *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *Broughton v. Heckler*, 776 F.2d 960, 960-961 (11th Cir. 1985); *Jones v. Bowen*, 810 F.2d 1001, 1005 (11th Cir. 1986).   "Good cause" exists when:   (1) the treating physician's opinion was not bolstered by the evidence; (2) the evidence supported a contrary finding;  or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's own medical records.  *Phillips,* 357 F.3d at 1241; *see also Lewis*, 125 F.3d at 1440 (citing cases).   If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with other substantial evidence in the record, the ALJ must give it controlling weight.   20 C.F.R. §§ 404.1527(d)(2), 416.927(c)(2).   Where a treating physician has merely made conclusory statements, however, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a

claimant's impairments. *Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also Schnor v. Bowen,* 816 F.2d 578, 582 (11th Cir. 1987).

When a treating physician's opinion does not warrant *controlling* weight, the ALJ nevertheless must weigh the medical opinion based on (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical impairments at issue; and (6) other factors which tend to support or contradict the opinion. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c)(2). "When electing to disregard the opinion of a treating physician, the ALJ must clearly articulate its reasons." *Phillips*, 357 F.3d at 1241. Failure to do so is reversible error. *Lewis*, 125 F.3d at 1440 (*citing MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986)); *see also Nyberg v. Comm'r of Soc. Sec.*, 179 F. App'x. 589, 591 (11th Cir. 2006).

Here, the ALJ gave "virtually no weight" to Dr. Almond's opinions. T. 28-29. He found the evidence contradicted Dr. Almond's opinion Ms. Camperlino's substance abuse was a symptom of her underlying condition. T. 29. He found Dr. Almond's opinion regarding Ms. Camperlino's specific mental limitations inconsistent with Dr. Almond's statement Ms. Camperlino could perform low stress work. T. 29. He found no evidence to substantiate Dr. Almond's opinion Ms.

Camperlino had marked limitations in neatness and cleanliness, at least on a sustained basis, noting the only such indication was during "brief crisis treatment." T. 29. He also found it inconsistent that Dr. Almond stated plaintiff had moderate limitations in the ability to understand and remember detailed instructions yet found marked limitations understanding one- or two-step instructions. T. 29. Finally, the ALJ noted Dr. Almond's opinion regarding disability is an opinion on an issue reserved solely to the Commissioner and thus is afforded no special significance. T. 29. The ALJ explained "[t]hese internal inconsistencies force the undersigned to give this opinion virtually no weight. Likewise, the inconsistency with the evidence adds to the diminution of the weight given." T. 29. The undersigned cannot say the ALJ erred in that regard, as his conclusion is supported by substantial evidence in the record.

In contrast to Dr. Almond, the ALJ gave "significant weight" to the opinions of non-examining state agency consultants, which he found supported by the record. T. 29. State agency consultants are highly qualified specialists who also are experts in Social Security disability evaluation, and their opinions may be entitled to great weight if the evidence supports them. 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i); SSR 96-6p, 1996 WL 374180, at *2 (S.S.A.). If the ALJ has good cause to afford a treating physician reduced weight, the ALJ may also rely on reports

from non-examining, non-treating physicians so long as the record supports the reports. *See Jones v. Bowen*, 810 F.2d 1001, 1005 (11th Cir. 1986).

Ms. Camperlino argues the ALJ failed to identify substantial evidence contradicting Dr. Almond's opinions and that the state agency consultants' opinions should not have been given greater weight than Dr. Almond's opinions because the state agency consultants did not have "the chance to review the opinions from Dr. Almond or opinions from any other examining medical source." (Doc. 15, pg. 19). Ms. Camperlino cites Social Security Ruling ("SSR") 96-6p and interprets the ruling as mandating that non-examining experts outweigh treating physicians' opinions only when the non-examining experts review a complete case record that includes a medical report from a specialist. (*Id.* at pg. 20). Defendant responds by stating the ALJ had good cause to assign state agency consultants' opinions greater weight than Dr. Almond's opinions because Dr. Almond's opinions were unsupported by the record and internally inconsistent. (Doc. 18, pg. 9-11).

SSR 96-6p states, in pertinent part:

> In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources. For example, the opinion of a State agency medical or psychological consultant or other program physician or psychologist may be entitled to greater weight than a treating source's medical opinion if the State agency medical or p[s]ychological

consultant's opinion is based on a review of a complete case record that includes a medical report from a specialist in the individual's particular impairment which provides more detailed and comprehensive information than what was available to the individual's treating source.

The key phrase in the above excerpt is "For example." Claimant's interpretation implies this is the only possibility; but because the ruling unambiguously allows assigning superior weight to non-examining experts than treating physicians, and because the ALJ had good cause to assign virtually no weight to Dr. Almond's opinions, the ALJ did not err in assigning greater weight to the state agency experts' opinions, particularly considering they were supported by the record and rendered by "specialists in mental health treatment." [6] T. 29.

B.    Credibility Determination

Claimant next asserts the ALJ failed to properly assess credibility. When a claimant attempts to prove disability based on subjective complaints, she must provide evidence of an underlying medical condition and either objective medical evidence confirming the severity of her alleged symptoms or evidence establishing that her medical condition could be reasonably expected to give rise to her alleged

---

[6] The undersigned acknowledges that one reasonably might conclude that, regrettably, Ms. Camperlino faces a risk of future psychiatric in-patient care or even suicide attempts. Such risk, however, does not render her disabled. And it is not this court's province to determine whether Ms. Camperlino is or is not disabled. It is the court's duty to determine whether the ALJ's decision is supported by substantial evidence in the record and, in this case, it is.

symptoms.   *See*   20   C.F.R.   §   404.1529(a),   (b);   SSR   96-7p
(https://www.socialsecurity.gov/OP_Home/rulings/di/01/SSR96-07-di-01.html);
*Wilson v. Barnhart*, 284 F.3d 1219, 1225-26 (11th Cir. 2002).   If the objective
medical evidence does not confirm she has an impairment that could reasonably be
expected to produce her alleged symptoms, the ALJ must evaluate the intensity and
persistence of the claimant's alleged symptoms and their effect on claimant's ability
to work.   *See* 20 C.F.R. § 404.1529(c), (d); SSR 96-7p; *Wilson,* 284 F.3d at 1225-
26.   In determining whether substantial evidence supports an ALJ's credibility
determination, "[t]he question is not . . . whether the ALJ could have reasonably
credited [claimant's] testimony, but whether the ALJ was clearly wrong to discredit
it."   *Werner v. Comm'r of Soc. Sec.*, 421 F. App'x. 935, 939 (11th Cir. 2011).

Interpreting these regulations, the Eleventh Circuit held that to establish
disability based on testimony of pain and other symptoms, a claimant must satisfy
two parts of a three-part test, showing: (1) evidence of an underlying medical
condition; and (2) either (a) objective medical evidence confirming the severity of
the alleged pain; or (b) that the objectively determined medical condition can
reasonably be expected to give rise to the claimed pain.   *See Wilson*, 284 F.3d at
1225 (*citing Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991)).   The regulations
contain the same language as the pain standard.   *See Wilson*, 284 F.3d at 1225; *Elam*

*v. R.R. Ret. Bd.,* 921 F.2d 1210, 1215 (11th Cir. 1991) (pain standard is "fully consistent with" the Commissioner's regulations).

When evidence documents an impairment that could reasonably be expected to produce symptoms alleged by a claimant, the Commissioner then evaluates the intensity and persistence of the symptoms to determine how the symptoms limit the claimant's capacity for work. *See* 20 C.F.R. § 404.1529(c)(1); *see Foote v. Charter*, 67 F.3d 1553, 1561 (11th Cir. 1995). Credibility determinations are the province of the ALJ. *See Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005). In making a credibility finding, the ALJ must articulate specific reasons for questioning plaintiff's credibility and the reasons for rejecting plaintiff's testimony must be supported by substantial evidence. *See Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). "A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court." *Foote*, 67 F.3d at 1562.

To determine credibility, the Commissioner considers objective medical evidence and information from the claimant and treating or examining physicians, as well as other factors such as evidence of daily activities, the frequency and intensity of pain, any precipitating and aggravating factors, medication taken and any resulting side effects, and any other measures taken to alleviate the claimant's

pain or other symptoms.  *See* 20 C.F.R. § 404.1529(c)(2), (3); SSR 96-7p; *see also*
*Dyer*, 395 F.3d at 1212 (finding the ALJ "adequately explained his reasons" for
discrediting claimant's pain testimony where "the ALJ considered [claimant's]
activities of daily living, the frequency of his symptoms, and the types and dosages
of his medications, and concluded that [claimant's] subjective complaints were
inconsistent with his testimony and the medical record").

In evaluating the extent to which a claimant's symptoms, such as pain, affect
her capacity to perform basic work activities, the ALJ appropriately considers all the
available evidence, including inconsistencies in the evidence, and the extent to
which there are conflicts between claimant's statements and the rest of the evidence,
including the history, signs and laboratory findings, and statements by treating and
non-treating sources or other persons about how the symptoms affect the claimant.
*See* 20 C.F.R. § 404.1529(c)(4).  The ALJ need not, however, enumerate every factor
in every decision.  *See Dyer*, 395 F.3d at 1210 (an ALJ's decision need only be
explicit enough to enable a reviewing court to determine the reasoning behind
findings); *Foote*, 67 F.3d at 1561 (the ALJ need not cite to particular phrases or
formulations in making the credibility determination, but must provide reasons that
would enable a reviewing court to conclude that the ALJ considered the claimant's
medical condition as a whole).

Ms. Camperlino argues the ALJ's credibility assessment was fallacious because the ALJ considered claimant's ability to go out alone, drive, perform light cleaning, watch television, and use the internet as evidence of lack of disability. Claimant posits engaging in sporadic activities of daily living does not mean she can withstand the mental demands of full-time work 8 hours a day, 40 hours a week at the direction of an employer.  Although unacknowledged by claimant, however, the ALJ may consider activities of daily living in determining disability. *Dyer*, 395 F.3d at 1212.  Here, the ALJ did not rely solely on Ms. Camperlino's daily activities in finding her not disabled.  Indeed, he considered the medical evidence, noting "inconsistencies" in treatment which "fail to support her alleged limitations," lack of follow-up treatment, and stabilization with medication and other treatment.  T. 27-28.  He also mentioned "a particularly strange examination in November 2012 when she explicitly complained that she was too weak to work even part time.  It was noted that her voice was shaky and she was twitchy.  It was noted that this was not her normal behavior at all."  T. 27.  The ALJ plainly felt Ms. Camperlino exaggerated her symptoms.  The ALJ thus properly considered Ms. Camperlino's subjective complaints and adequately explained his reasoning for finding her not entirely credible.

Ms. Camperlino also faults the ALJ for considering GAF scores when determining credibility because GAF scores are not indicative of any particular severity of mental functioning and are no longer used by the DSM. The ALJ in fact considered Ms. Camperlino's GAF scores. T. 27. As the Commissioner points out, however, GAF scores can be used as part of a holistic approach to determine the severity of mental illness. *See Winschel v. Comm'r of Soc. Sec.,* 631 F.3d 1176, 1178-79 (11th Cir. 2011). Moreover, the GAF scores were only one of a number of factors the ALJ considered in finding Ms. Camperlino not entirely credible. Accordingly, even if the ALJ erred in considering Ms. Camperlino's GAF scores -- which he did not -- such error was harmless.

C.     VE Hypothetical

Lastly, Ms. Camperlino urges the ALJ erred with regard to the hypothetical posed to the VE because he failed to include moderate difficulties in concentration, persistence, and pace and instead restricted claimant to simple, routine, and repetitive tasks "involving only simple work-related decision[s] and with few workplace changes." The ALJ's failure to include difficulties in concentration, persistence, and pace does not necessarily render the hypothetical erroneous. The Eleventh Circuit has recognized "[a]n ALJ may account for these limitations by limiting the hypothetical to unskilled work when medical evidence demonstrates that

a claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace." *Winschel*, 631 F.3d at 1180. That is precisely what the ALJ did here. He considered the medical evidence of record and concluded Ms. Camperlino could engage in simple, routine tasks or unskilled work despite her limitations. T. 24-29. The ALJ's hypothetical, therefore, was not erroneous.

CONCLUSION

For the reasons set forth above, the undersigned finds the Commissioner's decision supported by substantial evidence and application of the proper legal standards. It therefore should be affirmed.[7]

Accordingly, it is ORDERED:

1.    The decision of the Commissioner is AFFIRMED and plaintiff's applications for DIB and SSI are DENIED.

2.    The clerk is directed to close the file.

---

[7] The court notes that, to the extent it reviewed the legal principles upon which the ALJ's decision is based, it conducted a *de novo* review. *See Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

DONE AND ORDERED this 28th day of September, 2016.


_/s/_ _Charles J. Kahn, Jr._
**CHARLES J. KAHN, JR.**
**UNITEDSTATESMAGISTRATEJUDGE**